IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
NEBRASKA

| | | |
|---|---|---|
| KIRSTEN FAESSLER, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **AND JURY DEMAND** |
| vs. | ) | |
| | ) | |
| LEXINGTON REGIONAL HEALTH | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW Plaintiff, KIRSTEN FAESSLER, for her cause of action against Defendant, Lexington Regional Health Center, and hereby states and alleges the following.

## I.    NATURE OF THE ACTION

1.    This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., and the Nebraska Fair Employment Practice Act challenging Defendant's unlawful sex discrimination, hostile work environment, and retaliation against Plaintiff.

## II.    JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has supplemental jurisdiction over the State claims brought herein pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this claim occurred in Lexington, Dawson County, Nebraska, which is within the District of Nebraska.

## III.    PARTIES

1

4. Plaintiff Kirsten Faessler is a resident of Kearney, Buffalo County, Nebraska, and was an employee of Defendant Lexington Regional Health Center who worked as Chief Operating Officer.

5. Defendant Lexington Regional Health Center is a corporation doing business in Lexington, Dawson County, Nebraska. Defendant's principal place of business is 1201 N. Erie Street, Lexington, Nebraska 68850.

6. At all relevant times, Defendant employed at least fifteen (15) employees.

### IV. ADMINISTRATIVE PREREQUISITES

7. On September 24, 2025, Plaintiff filed a second Charge of Discrimination with the Equal Employment Opportunity Commission Kansas City Area Office, which was contemporaneously dual-filed with the Nebraska Equal Opportunity Commission, charge number 563-2025-05102, alleging sex discrimination, hostile work environment, and retaliation.

8. The second EEOC charge alleges unlawful employment practices occurring within three hundred (300) days or less from the date of filing the charge.

9. On March 26, 2026, the EEOC issued a right-to-sue letter for the second charge, terminating the processing of the Charge of Discrimination.]

### V. FACTUAL BACKGROUND

10. On June 10, 1996, Defendant hired Kirsten as a physical therapist.

11. Kirsten has a Master's degree in Physical Therapy from the University of Nebraska Medical Center.

12. Kirsten worked as a physical therapist for fourteen years, consistently receiving positive performance evaluations and feedback about her work.

13. During this period, Kirsten demonstrated dedication to patient care and developed extensive institutional knowledge of Defendant's operations.

14. In approximately 2010, Defendant promoted Kirsten to Director of Rehabilitation Services.

15.    In August 2020, Defendant promoted Kirsten to Chief Operating Officer and Clinic Administrator.

16.    As Chief Operating Officer, Kirsten supervised seventeen of twenty-seven leaders, representing more than seventy-five percent of all hospital operations and more than half of the senior leadership team.

17.    Kirsten's scope of responsibility included Clinic Nursing, Family Medicine Specialists, Outpatient Services, Radiology, Centralized Scheduling, Director of Rehabilitation Services, Laboratory, and Wellness.

18.    Kirsten supervised one hundred percent of hospital inpatient and outpatient services.

19.    Kirsten reported directly to the Chief Executive Officer.

20.    From 1996 through 2023, Kirsten consistently received positive performance evaluations and had no performance issues.

21.    In 2014, Kirsten raised quality-of-care concerns regarding Plum Creek Medical Group physicians dismissing specialist orders for patients.

22.    Kirsten confronted Dr. John Ford about these concerns.

23.    Following a failed mediation, Plum Creek Medical Group pulled hospital privileges.

24.    After this incident, Board Chair Rob Anderson's treatment of Kirsten began to change.

25.    In 2021, Chief Executive Officer Leslie Marsh raised concerns about information technology breaches, HIPAA violations, and governance failures at Defendant's hospital.

26.    In 2021, Chief Operating Officer Kirsten Faessler and Chief Nursing Officer Nicole Thorell witnessed dangerous activity on Marsh's computer and contradicted Chief Information Officer Rob Hanna when he falsely told the Board that Marsh had deleted files.

27.    Kirsten supported Marsh and confirmed that her concerns about IT breaches, HIPAA violations, and governance failures were valid.

28.    Also in 2021, Kirsten raised concerns about Dr. Brady Beecham's contract compliance and documentation issues.

29.    Kirsten and Chief Executive Officer Leslie Marsh met with Dr. Beecham to address these concerns, which resulted in Dr. Beecham's departure from the facility.

30.    After Dr. Beecham's departure, Board Chair Rob Anderson's treatment of Chief Executive Officer Leslie Marsh and Kirsten worsened.

31.    Anderson became upset when informed that Dr. Beecham's profile had been downloaded on Marsh's computer and told Marsh she had "better be careful" because Anderson had "taken enough hits because of her."

32.    Beginning in 2021, Defendant's workplace culture changed dramatically.

33.    Board members and male executives ridiculed Marsh, calling her "paranoid" and questioning her credibility for raising concerns about IT breaches, HIPAA violations, and governance failures.

34.    From 2021 through 2024, the culture became increasingly hostile, retaliatory, and secretive.

35.    During this time, Kirsten and other women in leadership were left out of key meetings.

36.    Female Board members were also left out of key meetings and discussions.

37.    On September 27, 2022, during a Board meeting, Kirsten informed those present that Board Member Tucker Case had been saying negative things about Marsh and Defendant's facility.

38.    Shortly after this interaction, Board Chairman Rob Anderson became angry about what happened at the meeting.

39.    Following the September 27, 2022 Board meeting, Anderson would not speak with Kirsten directly and would only communicate with her through other people.

40.    During future Board meetings, Anderson was aggressive toward Kirsten verbally and would not allow her to finish speaking.

4

41.    During one Finance Sub-Committee meeting, Kirsten had to hold her hand up and tell Anderson that she was not finished speaking yet.

42.    After the September 27, 2022 Board meeting, Anderson stopped making eye contact with Kirsten.

43.    In 2023, Defendant retained employment lawyer Brock Pohlmeier to investigate workplace concerns.

44.    Kirsten participated in the investigation and provided information supporting Marsh.

45.    Kirsten also provided examples of the toxic culture present at Defendant's hospital.

46.    Regardless, on February 27, 2024, the Board terminated Marsh.

47.    At the February 27, 2024 Board meeting, immediately after the vote to terminate Marsh passed, Board Chair Rob Anderson stated "we will need to deal with an interim."

48.    During a break at the February 27, 2024 meeting, Board member Kenneth Harbison spoke briefly with Chief Financial Officer Wade Eschenbrenner to confirm his willingness to accept the Interim CEO position if appointed by the Board.

49.    Despite Kirsten's long tenure, institutional knowledge, and supervisory scope over seventy-five percent of hospital operations, the Board of Directors did not consider Kirsten for the interim CEO position.

50.    Instead, the Board appointed Chief Financial Officer Wade Eschenbrenner, a less tenured and less experienced male leader, to serve as interim CEO.

51.    Eschenbrenner supervised only six leaders, representing fourteen point eight percent of hospital operations.

52.    In March 2024, Kirsten filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission.

53.    On March 12, 2024, the Board held a special meeting to formally appoint an interim CEO.

5

54. During the March 12, 2024 Board meeting, Board Member Pat Samway asked why Kirsten was not considered for the interim CEO position.

55. Samway argued that "the COO, who has operational integrity, should have been approached more than a CFO."

56. Board Chair Rob Anderson responded that Kirsten could not sign contracts.

57. The Board could have easily authorized Kirsten to sign contracts with a simple motion.

58. On March 12, 2024, the Board voted four to one to appoint Eschenbrenner as Interim CEO.

59. Board Member Pat Samway cast the sole dissenting vote.

60. When Jason Douglas later became CEO, he was allowed to sign contracts following a special board meeting.

61. In 2024, following Marsh's termination, female executives including Kirsten, Rael Woerhle, Jill Denker, and Sheri Seitz received the lowest performance evaluation scores of their careers.

62. These performance scores were issued under Wade Eschenbrenner's leadership.

63. In 2024, Kirsten received a performance evaluation score of 2.2, the lowest evaluation score of her twenty-eight-year career.

64. Woerhle, Denker, and Seitz also received the lowest performance scores of their entire careers in 2024.

65. All four women had openly supported Marsh and confirmed that her concerns about IT breaches, HIPAA violations, and governance failures were valid.

66. Male executives were not subjected to the same scrutiny or given similarly low performance evaluations as their female counterparts.

67. In 2024, after being named interim CEO, Wade Eschenbrenner singled Kirsten out and berated her in front of other leaders during meetings.

68.   On January 29, 2025, during a senior leadership meeting, Eschenbrenner questioned Kirsten about clinic performance and outward migration.

69.   During the January 29, 2025 meeting, Eschenbrenner directed Director of Finance Tara Naprstek to display data on a screen.

70.   When Kirsten questioned the accuracy of the data presented, she left the meeting to retrieve accurate reports and returned to present corrected information.

71.   While serving as interim CEO, Eschenbrenner excluded Kirsten from C-Suite meetings, including planning meetings.

72.   Kirsten learned of her exclusion from a fellow C-Suite member; otherwise, she would not known about being left out.

73.   Being excluded from C-Suite meetings directly interfered with Kirsten's ability to carry out her responsibilities as Chief Operating Officer.

74.   Eschenbrenner held weekly meetings for the entire C-Suite office area but did not include Kirsten.

75.   When Chief Experience Officer Mike Dowling asked Kirsten why she did not attend, Plaintiff told him she did not know the meetings occurred.

76.   Dowling responded that he thought Kirsten was excluded and that it was "not right."

77.   On February 26, 2025, Eschenbrenner sent an email to all staff stating that employees could not contact Board members directly without CEO approval.

78.   Multiple employees contacted Kirsten expressing anger about the email.

79.   Employees stated that Board members had previously contacted them directly to gather information against Marsh, but now the same Board was restricting employee communication with Board members.

80.   Provider Steph Reutlinger called Kirsten and said, "How is it that it's perfectly okay for Ken Harbison to call me to get info on Leslie to get her fired, but now it's not okay for us to contact a board member?"

81.     Jennifer McDaniel told Kirsten she was printing the email because she was "fearful that the email would be retracted" and stated "this is the very way that they fired Leslie."

82.     In March 2025, Defendant named Jason Douglas as CEO.

83.     Eschenbrenner returned to his prior CFO position.

84.     Initially, Jennifer McDaniel told Kirsten that Douglas had stated that he hoped Kirsten was not leaving and acknowledged her institutional knowledge at the hospital.

85.     Douglas invited Kirsten to C-Suite weekly meetings, stating, "I'm not sure I understand the intent of this meeting and why you were not included, but you will be going forward."

86.     This acknowledgment by Douglas confirmed that Kirsten had been excluded from meetings during Eschenbrenner's tenure as interim CEO.

87.     In May or June 2025, Douglas's treatment of Kirsten changed.

88.     Douglas became less friendly in his interactions with Kirsten.

89.     In August 2025, hospital employees voted Kirsten as Employee of the Month.

90.     The nominating statement described Kirsten as "strong willed, dedicated and definitely more than deserving to be recognized for her hard work for our facility."

91.     On August 11, 2025, Douglas presented Kirsten with a Performance Improvement Plan.

92.     Kirsten was not given any prior notice that she would be placed on a Performance Improvement Plan.

93.     Douglas had not conducted any formal performance discussions with Kirsten prior to presenting the Performance Improvement Plan.

94.     Human Resources was not present at the August 11, 2025 meeting.

95.     Instead, Wade Eschenbrenner, Kirsten's peer who was not her supervisor, sat in on the meeting.

96.     During the August 11, 2025 meeting, Douglas stated, "Wade is here because for meetings like this, I like to have someone present for these HR issues."

97.     Chief Human Resources Officer Jill Denker knew nothing about Kirsten's Performance Improvement Plan until Kirsten informed her that day.

98.     The Performance Improvement Plan was nine pages long and required Kirsten to take responsibility for hospital-wide issues.

99.     The Performance Improvement Plan was based on a community sentiment survey that had been active for two weeks and represented less than one percent of the service area population.

100.    The survey link was posted publicly on Facebook and Instagram, and the same person could take the survey multiple times.

101.    The Performance Improvement Plan lacked clear definitions, baselines, or objective criteria.

102.    The Performance Improvement Plant required Kirsten to gather baseline data herself, which Douglas would then use to evaluate her performance.

103.    On August 12, 2025, Kirsten sent a letter requesting clarification of the Performance Improvement Plan.

104.    Kirsten asked for definitions of vague terms such as "appointment backlogs," "scheduling efficiency," and "wait times."

105.    Kirsten pointed out that current call answer rates were already above ninety-five percent and that requiring a fifty percent improvement from that baseline was impossible.

106.    Kirsten also asked how "meeting attendance and engagement" would be measured objectively.

107.    When Kirsten provided data to meet the baseline expectations, Douglas dismissed her results as "not meaningful."

108. The validators assigned to review Kirsten's progress, Brian Hemmer and Mike Dowling, privately told Kirsten that they would not have accepted such treatment and said, "If it were us, we would have left with both fingers in the air."

109. Sheri Seitz spent more than twelve hours extracting data to help Kirsten satisfy the demands of the Performance Improvement Plan.

110. The demands of the Performance Improvement Plan created overwhelming stress and anxiety.

111. Kirsten's medical provider certified Plaintiff for continuous Family and Medical Leave due to situational anxiety caused by the hostile workplace.

112. On September 2, 2025, while on FMLA leave, Kirsten submitted a resignation letter with a thirty-day notice, stating her last day would be October 2, 2025.

113. In her resignation letter, Kirsten stated, "The toxicity in my current work environment has created overwhelming physical, emotional and mental stress that I do not feel safe continuing to work in."

114. Kirsten explained in her resignation letter that she had been excluded from meetings, not considered for interim CEO despite her supervisory scope, and placed on a Performance Improvement Plan without prior performance feedback from Douglas.

115. Kirsten further explained that Eschenbrenner was present at the Performance Improvement Plan meeting instead of Human Resources, and that validators told her "if it were us, we would have left with both fingers in the air."

116. Kirsten stated that she had hoped to complete her career at Defendant's hospital but could no longer continue under such conditions.

117. On September 6, 2025, Board member Tammy Reynolds told a nurse at the clinic that Kirsten "got out before we were going to fire her" and that the Board had "already been talking to Dana [Steiner] and Nicole [Thorell]."

118. On September 8, 2025, three business days after Kirsten's resignation, Douglas announced to all staff that Nicole Thorell would serve as Interim Chief Operating Officer effective September 10, 2025.

119. The same announcement stated that two new positions would be posted: Chief Population Health & Quality Officer and Chief Operating

Officer/Chief Nursing Officer, with applications accepted through September 11, 2025.

120.    The rapid announcement and posting of Kirsten's replacement position, combined with Reynolds's statement, demonstrated that Defendant had already planned to replace Kirsten before she resigned.

121.    October 2, 2025, was Plaintiff's last day of employment.

122.    Throughout the period from 2021 through 2025, male executives were not subjected to the same scrutiny or hostility that Kirsten experienced.

123.    Female executives, including Leslie Marsh, Kirsten, Rael Woerhle, Jill Denker, and Sheri Seitz, were held to higher standards, evaluated more harshly, and excluded from leadership opportunities.

124.    During her FMLA leave, Kirsten's stress and anxiety increased at the thought of returning to the toxic environment.

125.    Kirsten's resignation was not voluntary but was instead compelled by the hostile and retaliatory treatment she experienced at Defendant's hospital.

126.    On September 24, 2025, Kirsten filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Nebraska Equal Opportunity Commission, alleging sex discrimination, hostile work environment, and retaliation.

127.    Kirsten heard from employees and community members that she had been labeled as one of the "five musketeers" that the new CEO wanted gone.

128.    All five individuals regularly referred to as "musketeers" were women.

129.    These rumors and characterizations created an atmosphere of fear and intimidation among female leaders at Defendant's hospital.

130.    The Performance Improvement Plan presented to Kirsten on August 11, 2025, stated that upon failure to meet standards, Defendant could take "additional performance management actions up to and including: reassignment, demotion, termination."

131.    The Performance Improvement Plan required Kirsten to achieve twenty to twenty-five percent improvements in Phase 1 and fifty to one hundred percent improvements in Phase 2.

11

132.    The Performance Improvement Plan gave Kirsten three days to submit a plan, twenty-four hours to accept the plan, and one week to submit baseline data.

133.    Kirsten was required to have all metrics validated by Brian Hemmer and Michael Dowling.

134.    The Performance Improvement Plan stated that "Inability to measure = Automatic metric failure."

135.    Despite the demands placed on Kirsten, male executives including Chief Financial Officer Wade Eschenbrenner were not held to similar standards.

136.    Eschenbrenner was never placed on a Performance Improvement Plan despite Defendant's accounts receivable exceeding ten million dollars and alleged timely-filing write-offs of approximately one point five million dollars.

137.    Eschenbrenner was not disciplined for publicly berating Kirsten or excluding her from meetings.

138.    The systematic exclusion of female leaders from meetings, the disparate performance evaluations, the public berating of female executives, and the denial of advancement opportunities for women created a pervasive hostile work environment based on sex.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### SEX DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, et seq.

139.    Plaintiff realleges paragraphs 1-138 of this Complaint as if fully set forth herein.

140.    Defendant discriminated against Plaintiff based on her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., when Defendant:

    a.    Denied Plaintiff consideration for the interim CEO position in March 2024 despite her long tenure, institutional knowledge, and supervisory scope over seventy-five percent of hospital

operations, and instead appointed Chief Financial Officer Wade Eschenbrenner, a less tenured and less experienced male leader who supervised only fourteen point eight percent of operations.

b.  Provided pretextual reasons for not considering Plaintiff for interim CEO, stating she could not sign contracts, while later immediately allowing male CEO Jason Douglas to sign contracts upon his appointment.

c.  Singled Plaintiff out for public berating and harsh criticism during leadership meetings by interim CEO Wade Eschenbrenner, including the January 29, 2025 senior leadership meeting, while male executives were not subjected to similar treatment.

d.  Excluded Plaintiff from C-Suite meetings and planning meetings during Eschenbrenner's tenure as interim CEO, directly interfering with her ability to carry out her responsibilities as Chief Operating Officer.

e.  Issued Plaintiff the lowest performance evaluation score of her twenty-eight-year career in 2024, along with other female executives who supported Chief Executive Officer Leslie Marsh, while male executives were not subjected to the same scrutiny or given similarly low evaluations.

f.  Subjected Plaintiff to a Performance Improvement Plan on August 11, 2025, without prior formal performance discussions, based on flawed and undefined metrics, while male executives including Eschenbrenner were not subjected to similar treatment despite documented performance failures in their departments.

g.  Required Plaintiff's peer Wade Eschenbrenner to be present at the Performance Improvement Plan meeting instead of Human Resources, creating an unprofessional and intimidating environment.

> h.    Constructively discharged Plaintiff through a hostile and discriminatory work environment that made continued employment intolerable.

141.    Plaintiff is a member of a protected class.

142.    Plaintiff was qualified for her position and was meeting Defendant's legitimate job expectations.

143.    Plaintiff suffered multiple adverse employment actions throughout her employment.

144.    Plaintiff's sex was a motivating factor in Defendant's decision-making regarding Plaintiff's terms and conditions of employment.

145.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with Title VII of the Civil Rights Act of 1964.

## SECOND CAUSE OF ACTION
### SEX-BASED HOSTILE WORK ENVIRONMENT
### UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e et seq.

146.    Plaintiff realleges paragraphs 1-145 of this Complaint as if fully set forth herein.

147.    Defendant subjected Plaintiff to a hostile work environment based on her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., when Defendant:

a. Beginning in 2021, excluded Plaintiff and other female executives from C-Suite meetings and planning meetings while including male executives, creating a pattern of systematic exclusion based on sex.

b. Publicly berated Plaintiff during leadership meetings through interim CEO Wade Eschenbrenner in front of colleagues, including the January 29, 2025 senior leadership meeting where colleagues told Plaintiff the confrontation was inappropriate.

c. Ridiculed female Chief Executive Officer Leslie Marsh as "paranoid" when she raised legitimate concerns about IT breaches, HIPAA violations, and governance failures, perpetuating stereotypes about women being hysterical when raising concerns.

d. Subjected Plaintiff, Rael Woerhle, Jill Denker, and Sheri Seitz to the lowest performance evaluations of their careers in 2024 following their support for Chief Executive Officer Leslie Marsh, while male executives were not similarly targeted.

e. Created a culture targeting women in leadership positions by restricting employee communication with Board members through Eschenbrenner's February 26, 2025 email, while Board members had previously solicited negative information from staff about female CEO Marsh without restriction.

f. Permitted community rumors identifying Plaintiff as one of the "five musketeers" that leadership wanted gone, where all five identified individuals were women.

g. Excluded female Board members from key meetings while male Board members controlled decisions and deliberations.

148. Plaintiff is a member of a protected class.

149. The conduct was unwelcome and based on Plaintiff's sex.

15

150.    The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an objectively and subjectively abusive working environment.

151.    The harassment is attributable to Defendant.

152.    This hostile environment contributed to Plaintiff's constructive discharge and caused physical, emotional, and mental stress requiring medical treatment and FMLA leave.

153.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with Title VII of the Civil Rights Act of 1964.

## THIRD CAUSE OF ACTION
### RETALIATION
### UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e et seq.

154.    Plaintiff realleges paragraphs 1-153 of this Complaint as if fully set forth herein.

155.    Plaintiff engaged in protected activity when she:

a.    Raised quality-of-care concerns regarding Plum Creek Medical Group physicians in 2014;

b.    Raised concerns about Dr. Brady Beecham's contract compliance and documentation issues in 2021;

16

   c.   Supported Chief Executive Officer Leslie Marsh and confirmed
        that her concerns about IT breaches, HIPAA violations, and
        governance failures were valid;

   d.   Participated in the 2023 Brock Pohlmeier investigation into
        workplace concerns and provided information supporting Chief
        Executive Officer Leslie Marsh;

   e.   Filed a Charge of Discrimination with the Nebraska Equal
        Opportunity Commission in March 2024; and

   g.   Opposed other discriminatory practices prohibited by Title VII.

156.   Defendant retaliated against Plaintiff because of her protected activity.

157.   Defendant subjected Plaintiff to adverse employment actions, including:

   a.   Excluding her from C-Suite meetings and planning meetings
        during Wade Eschenbrenner's tenure as interim CEO;

   b.   Public berating during leadership meetings, including the
        January 29, 2025 senior leadership meeting;

   c.   Giving her the lowest performance evaluation score of her career
        in 2024;

   d.   Placing her under a Performance Improvement Plan on August
        11, 2025, without prior formal performance discussions and
        based on flawed metrics; and

   e.   Constructive discharge through a hostile work environment that
        made continued employment intolerable.

158.   There is a causal connection between Plaintiff's protected activity and
the adverse actions she suffered.

159. The adverse actions followed temporally and proximately from Plaintiff's protected activity, including receiving her career-low evaluation in 2024 after filing her NEOC charge in March 2024, and being subjected to the Performance Improvement Plan in August 2025.

160. Plaintiff's protected activity was a motivating factor in Defendant's actions against her.

161. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with Title VII of the Civil Rights Act of 1964.

## FOURTH CAUSE OF ACTION
### SEX DISCRIMINATION UNDER
### THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### NEB. REV. STAT. § 48-1101, ET SEQ.

162. Plaintiff realleges paragraphs 1-161 of this Complaint as if fully set forth herein.

163. Defendant discriminated against Plaintiff based on her sex in violation of the Nebraska Fair Employment Practice Act, when Defendant:

> a. Denied Plaintiff consideration for the interim CEO position in March 2024 despite her long tenure, institutional knowledge, and supervisory scope over seventy-five percent of hospital operations, and instead appointed Chief Financial Officer Wade Eschenbrenner, a less tenured and less experienced male leader who supervised only fourteen point eight percent of operations.

> b. Provided pretextual reasons for not considering Plaintiff for interim CEO, stating she could not sign contracts, while later

immediately allowing male CEO Jason Douglas to sign contracts upon his appointment.

c.    Singled Plaintiff out for public berating and harsh criticism during leadership meetings by interim CEO Wade Eschenbrenner, including the January 29, 2025 senior leadership meeting, while male executives were not subjected to similar treatment.

d.    Excluded Plaintiff from C-Suite meetings and planning meetings during Eschenbrenner's tenure as interim CEO, directly interfering with her ability to carry out her responsibilities as Chief Operating Officer.

e.    Issued Plaintiff the lowest performance evaluation score of her twenty-eight-year career in 2024, along with other female executives who supported Chief Executive Officer Leslie Marsh, while male executives were not subjected to the same scrutiny or given similarly low evaluations.

f.    Subjected Plaintiff to a Performance Improvement Plan on August 11, 2025, without prior formal performance discussions, based on flawed and undefined metrics, while male executives including Eschenbrenner were not subjected to similar treatment despite documented performance failures in their departments.

g.    Required Plaintiff's peer Wade Eschenbrenner to be present at the Performance Improvement Plan meeting instead of Human Resources, creating an unprofessional and intimidating environment.

h.    Constructively discharged Plaintiff through a hostile and discriminatory work environment that made continued employment intolerable.

164.    Plaintiff is a member of a protected class.

165.    Plaintiff was qualified for her position and was meeting Defendant's legitimate job expectations.

19

166.    Plaintiff suffered multiple adverse employment actions throughout her employment.

167.    Plaintiff's sex was a motivating factor in Defendant's decision-making regarding Plaintiff's terms and conditions of employment.

168.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the Nebraska Fair Employment Practice Act

**FIFTH CAUSE OF ACTION**
**SEX-BASED HOSTILE WORK ENVIRONMENT**
**NEBRASKA FAIR EMPLOYMENT PRACTICE ACT**
**NEB. REV. STAT. § 48-1101, ET SEQ.**

169.    Plaintiff realleges paragraphs 1-168 of this Complaint as if fully set forth herein.

170.    Defendant subjected Plaintiff to a hostile work environment based on her sex in violation of the Nebraska Fair Employment Practice Act, when Defendant:

a.    Beginning in 2021, excluded Plaintiff and other female executives from C-Suite meetings and planning meetings while including male executives, creating a pattern of systematic exclusion based on sex.

b.    Publicly berated Plaintiff during leadership meetings through interim CEO Wade Eschenbrenner in front of colleagues, including the January 29, 2025 senior leadership meeting where colleagues told Plaintiff the confrontation was inappropriate.

c.    Ridiculed female Chief Executive Officer Leslie Marsh as "paranoid" when she raised legitimate concerns about IT breaches, HIPAA violations, and governance failures, perpetuating stereotypes about women being hysterical when raising concerns.

d.    Subjected Plaintiff, Rael Woerhle, Jill Denker, and Sheri Seitz to the lowest performance evaluations of their careers in 2024 following their support for Chief Executive Officer Leslie Marsh, while male executives were not similarly targeted.

e.    Created a culture targeting women in leadership positions by restricting employee communication with Board members through Eschenbrenner's February 26, 2025 email, while Board members had previously solicited negative information from staff about female CEO Marsh without restriction.

f.    Permitted community rumors identifying Plaintiff as one of the "five musketeers" that leadership wanted gone, where all five identified individuals were women.

g.    Excluded female Board members from key meetings while male Board members controlled decisions and deliberations.

171.    Plaintiff is a member of a protected class.

172.    The conduct was unwelcome and based on Plaintiff's sex.

173.    The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an objectively and subjectively abusive working environment.

174.    The harassment is attributable to Defendant.

175.    This hostile environment contributed to Plaintiff's constructive discharge and caused physical, emotional, and mental stress requiring medical treatment and FMLA leave.

176.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and

21

emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the Nebraska Fair Employment Practice Act.

## SIXTH CAUSE OF ACTION
### RETALIATION
### NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### NEB. REV. STAT. § 48-1101, ET SEQ.

177. Plaintiff realleges paragraphs 1-176 of this Complaint as if fully set forth herein.

178. Plaintiff engaged in protected activity when she:

a. Raised quality-of-care concerns regarding Plum Creek Medical Group physicians in 2014;

b. Raised concerns about Dr. Brady Beecham's contract compliance and documentation issues in 2021;

c. Supported Chief Executive Officer Leslie Marsh and confirmed that her concerns about IT breaches, HIPAA violations, and governance failures were valid;

d. Participated in the 2023 Brock Pohlmeier investigation into workplace concerns and provided information supporting Chief Executive Officer Leslie Marsh;

e. Filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission in March 2024; and

f. Opposed other discriminatory practices prohibited by Title VII.

179. Defendant retaliated against Plaintiff in violation of the Nebraska Fair Employment Practice Act because of her protected activity.

22

180.    Defendant subjected Plaintiff to adverse employment actions, including:

a.    Excluding her from C-Suite meetings and planning meetings during Wade Eschenbrenner's tenure as interim CEO;

b.    Public berating her during leadership meetings, including the January 29, 2025 senior leadership meeting;

c.    Giving her the lowest performance evaluation score of her career in 2024;

d.    Placing her under a Performance Improvement Plan on August 11, 2025, without prior formal performance discussions and based on flawed metrics; and

e.    Constructive discharge through a hostile work environment that made continued employment intolerable.

181.    There is a causal connection between Plaintiff's protected activity and the adverse actions she suffered.

182.    The adverse actions followed temporally and proximately from Plaintiff's protected activity, including receiving her career-low evaluation in 2024 after filing her NEOC charge in March 2024, and being subjected to the Performance Improvement Plan in August 2025.

183.    Plaintiff's protected activity was a motivating factor in Defendant's actions against her.

184.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, earnings and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such

other relief as may be just in the circumstances and consistent with the Nebraska Fair Employment Practice Act.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex, creates a hostile work environment, or retaliates against employees for engaging in protected activity.

B.    Order the Defendant to pay Plaintiff back pay from the date of constructive discharge through judgment, front pay, compensatory damages for emotional distress, pain and suffering, humiliation, embarrassment, and loss of enjoyment of life, consequential damages for all losses suffered, as well as all other affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices.

C.    Direct the Defendant to expunge all negative reports, evaluations, and disciplinary actions from Plaintiff's personnel file, specifically including the 2024 performance evaluation and the August 2025 Performance Improvement Plan.

D.    Award the Plaintiff her reasonable attorneys' fees and expert witness fees as authorized by Title VII of the Civil Rights Act of 1964 and the Nebraska Fair Employment Practice Act.

E.    Award Plaintiff her costs in this action.

F.    Grant such further relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all matters raised in this Complaint.

24

Respectfully Submitted,


*/s/ Thomas J. Freeman*

Thomas J. Freeman, #23639

Fiedler Law Firm, PLC

17330 Wright Street, Suite 102

Omaha, NE 68130

(402) 316-3060

(402) 513-6501 (facsimile)

tom@employmentlawnebraska.com


Amy R. Beck, #27709

Iowa Employment Attorneys, PLC

1401 SE Westown Parkway, Unit 212

West Des Moines, IA 50266

(515) 465-1632

(515) 513-4657 (facsimile)

amy@iowaemploymentattorneys.com


Attorneys for Plaintiff

25